The Central Railroad and Banking Company v. Dodd.

1. There was sufficient evidence to authorize the verdict.
2. When the character of a witness has been attacked by proof of specific immoral acts, proof of his general good character may be introduced to sustain him.

October 21, 1889.

Railroads. Damages. Negligence. Verdict. Witness. Character. Before Judge Marshall J. Clarke. Fulton superior court. March term, 1889.

J. D. Dodd sued the railroad company for a personal injury claimed to have been caused by the negligence of defendant, laying his damages at $4,000. He alleged, and introduced evidence to show, that on July 26, 1886, he was in a car containing a load of melons which he had purchased, the car belonging to defendant and having been placed by it on one of its side-tracks; that plaintiff was selling melons therefrom; that defendant's servants attached this car to others and pulled them down its track and then backed the train with great force against a stationary car, throwing plaintiff violently against the side of the car in which he was, by which his arm was broken and his body badly bruised; that he was without fault and had a' right to be in the car, and his injury was due to defendant's negligence in moving the car from where it had been placed, in running the train at too great speed, and in striking violently against the stationary car; that he bought the car of melons on defendant's track with its knowledge and consent, and had its permission to sell from the car, which had been placed by defendant on this side-track, called the "melon track," for the purpose of enabling him to sell there; that he had been making from $15 to $20 per day during the summer selling melons from cars on the track, and could have continued to do so during the remainder

of the melon season, about sixty days longer; and that he could have made $75 per month, beginning with September, but by reason of the injury he was unable to do anything for three months, and his ability to work was not one third of what it had been. He showed that he had been put to $100 expense for physician's bill. He was about 41 years old at the time of the injury. He purchased this car of melons from W. L. Stanton. He had previously sold 13 other car-loads from defendant's track, and on the day in question, went to the company's office as he had usually done, and told one of the company's agents that he had a car he wanted placed in position where he could sell the melons, and they placed it for him. It was customary for the company to allow this privilege by way of accommodation, and usually about two days were given in which to dispose of the car-load. The car in question, with others, was shifted by defendant's servants violently against a stationary car, the one already indicated, and the plaintiff was thrown violently against the door; he would have been thrown out if his arm had not caught the door. Another person in another car of the same train, and engaged in the same business, was lying down on a plank with one end raised about a foot and a half. This plank was tilted and the man rolled over. It was a pretty hard lick. The yard-conductor in charge of this train, a moment before the jar, was heard to cry out, with an oath, "Hold up there, you will kill somebody." It was customary for those who had melons in the cars to sit therein, the cars being open. Before this time, they had been shifted by engines, and when this was about to be done, the persons inside were told by some one outside to take in their ladders, which were used to climb into the side of the cars. The plaintiff was treated by a physician. He suffered considerable pain. His

arm, both bone and muscle, was fractured; and the last time the physician examined it, he found the bone united probably as strong as ever, but the muscular trouble was still present and was likely to continue.

For the defendant, two physicians testified that a simple fracture of the bone and laceration or fracture of the muscle in the arm of a man of plaintiff's age, by proper medical treatment, tended in the course of six weeks to two months to make a perfect healthy re-union. The freight agent of defendant testified that, according to his recollection, the company had no consignment of melons to the plaintiff, though it had to many others; that the custom of the company was to allow its patrons to use cars for selling watermelons, but when they were being so used it was at the risk of the patrons, so that if the cars were moved away the company would not be liable; that he told the yard-conductors to tell all the people who were dealing in melons in the company's yard that it was at their own risk, etc., though he did not recollect notifying plaintiff, but knew that the customers of the road had been notified of the existence of this rule; he knew this from what his employés told him. (This testimony as to notice of rule or custom was subsequently ruled out.) The yard-conductor denied using the language attributed to him. It was a new car that plaintiff had opened; there was no room for it on the front track, which was the track everybody wanted to get on for retailing purposes, and so it was put upon a side-track, and the yard-conductor heard no more of it until the evening he heard that plaintiff's arm was broken. When he coupled on the cars, he went down the track and told everybody to take up their ladders as he was going to move the cars, and this is what he did in reference to this particular car. The speed of the train was probably not more than three miles an hour, and there was

nothing unusual about it. It was not too fast to make a coupling. If it had been, the cars would probably have jumped from the track, which was sharply curved there. Sometimes they did so anyhow, although the speed was always slow. The engineer testified that his habit was, when he made a coupling, to come back as easily as possible according to the signal, and he did not usually run more than two miles an hour in the yard. None of defendant's servants appear to have known of plaintiff's injury at the time or immediately after it happened, but to have heard of it subsequently during that day.

The jury found for the plaintiff $1,000. The defendant excepted to the refusal of a new trial.

JACKSON & JACKSON, for plaintiff in error.
HOKE & BURTON SMITH, *contra.*

SIMMONS, Justice.

The grounds relied on for a reversal of the judgment of the trial judge in refusing to grant a new trial in this case, are, in substance, that the verdict is contrary to law and without evidence to support it, and that the court erred in allowing the plaintiff in the court below to introduce proof of his good character after the defendant had sought to prove that the plaintiff, several years ago, was guilty of larceny.

1. The evidence, as will be seen from the official report, was conflicting as to the negligence and diligence of the servants of the railroad company. If the jury believed the testimony of the witnesses for the plaintiff, it was sufficient to authorize their finding. Where the evidence is conflicting upon a material question in the case, and so nearly balanced as it was in this case, we cannot say that the jury erred in believing one witness in preference to the other. The credibility of the witnesses is alone for the jury.

2. It appears that during the cross-examination of the plaintiff, the defendant's counsel asked him if he had not been arrested for stealing goods from his employer while clerking for him several years ago. It further appears that the defendant introduced one Talley, who testified that the plaintiff, while clerking for him ten or twelve years ago, did take goods from the store and secrete them, and afterwards carried them to a lewd woman; that he was arrested and put in prison; that his father paid for the goods; and that plaintiff promised to leave the State. Upon this state of facts, the trial judge allowed plaintiff to put in evidence his general good character, and error is assigned on this ruling.

We are inclined to think that the court was right. While it was not an attempt to impeach the plaintiff in the manner pointed out in our code, by proving that his general character was so bad that he was unworthy of belief as a witness, still it was such an attack upon his character as to weaken and discredit it to such an extent that the jury might not have believed him had he not sustained his character by the proof allowed by the court. The authorities are somewhat conflicting upon this question, but we think the fairer rule, when the character of a witness has been attacked by proof of specific immoral acts, as was done in this case, is to allow the witness to sustain himself by proof of his general good character since such acts were committed. A man may be guilty of immoral acts in his youth, and may repent and lead a pure and moral life ever afterwards. It would be unjust to him to allow this attack to be made upon him, and not to allow him to show that since that time he has established among his neighbors a good character, such as to render him worthy of belief in a court of justice.

*Judgment affirmed.*