CRIMINAL LAW ⊂⊃1092, 1099 — APPEAL — BILLS OF EXCEPTION—STATEMENT OF FACTS —TIME OF FILING.

Appellant was tried during a term of court which adjourned January 23, 1915. During the term no order was made authorizing the filing of a bill of exceptions or a statement of facts after term time. On February 12th appellant filed a bill of exceptions. On February 22d, in vacation, the court extended the time for filing a statement of facts for 30 days. The statement was not filed until March 29th. *Held*, that the bill of exceptions and statement of facts could not be considered, because filed too late and without an order permitting it during term time.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2803, 2829, 2834–2861, 2866–2880, 2919; Dec. Dig. ⊂⊃1092, 1099.]

Appeal from Fayette County Court; George Willrich, Judge.

Adolph Becker was convicted of simple assault, and he appeals. Affirmed.

C. C. McDonald, Asst. Atty. Gen., for the State.

PRENDERGAST, P. J. Upon an indictment, properly transferred to the county court, appellant was prosecuted and convicted of simple assault, with the lowest penalty assessed.

The term of court at which he was tried convened on January 4, and adjourned on January 23, 1915. During the term no order was made authorizing the filing of a statement of facts or bills of exceptions after term time. On February 12, 1915, appellant filed his only bill of exceptions. On February 22d, in vacation, the court, at appellant's instance, entered an order extending the time 30 days longer from that date for the filing of a statement of facts. What purports to be a statement of facts was not filed until March 29, 1915. The Assistant Attorney General moves this court to strike out and not consider said bill of exceptions and statement of facts, because filed too late and without any order permitting it during term time. Under the statute and the uniform decisions of this court, this motion must be sustained.

However, we might say that we have read both the bill and the statement of facts. Clearly, if we could consider the bill, as qualified by the court, it presents no error at all. The only question raised, so far as the statement of facts is concerned, is the claimed insufficiency of the evidence to sustain

the verdict. If we could consider it, it would show that the evidence amply sustains the verdict. So that, if we could consider either or both the bill and statement of facts, no error is presented.

The judgment is therefore affirmed.

---

### GHENT v. STATE. (No. 3516.)

(Court of Criminal Appeals of Texas. April 21, 1915. On Motion for Rehearing, May 12, 1915. Dissenting Opinion May 24, 1915.)

1. CRIMINAL LAW ⊂⊃398—BEST EVIDENCE— ACQUITTAL OF CRIME—FAILURE TO INDICT.

The record in the case is the best evidence of an acquittal; but, since there was no record where the grand jury failed to indict, oral testimony was admissible to prove that fact.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 879–886; Dec. Dig. ⊂⊃ 398.]

2. CRIMINAL LAW ⊂⊃695—TRIAL—OBJECTION TO EVIDENCE—EVIDENCE PARTLY ADMISSIBLE.

An objection to evidence a part of which was admissible was properly overruled; since objection must be directed specifically to the inadmissible part in such case.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1633–1638; Dec. Dig. ⊂⊃ 695.]

3. HOMICIDE ⊂⊃169—EVIDENCE — MATERIALITY.

In a prosecution for manslaughter, where defendant had been sent into a certain district in an attempt to stop the negro-terrorizing activities of "Whitecappers," with whom the deceased was thought to be connected, and where a negro, a tenant of the defendant's employer, received a notice warning him to leave such land, no proof being made by the defendant connecting the deceased with such notice, the notice itself was not admissible in evidence.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 341–350; Dec. Dig. ⊂⊃169.]

4. HOMICIDE ⊂⊃188—EVIDENCE—CHARACTER OF DECEASED.

In a prosecution for manslaughter, where the defendant attacked the character of deceased as a peaceable citizen by testifying that certain persons told him that deceased was as bad a man as there was in that neck of the woods and would need to be watched, evidence supporting the character of deceased was admissible on behalf of the state.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 391–397; Dec. Dig. ⊂⊃188.]

5. HOMICIDE ⊂⊃300 — SELF-DEFENSE — INSTRUCTION.

In a prosecution for manslaughter, the court charged that, if the jury believed from the evidence that, when the controversy arose between defendant and deceased, defendant was the aggressor and rode his horse at the deceased, then the law would not require the deceased to retreat, and, if deceased took hold of the reins of the horse to push him away, or made an assault on the defendant with his knife in order to repel the acts of defendant, then such acts on the part of deceased were not unlawful, provided he used no more force than necessary, but that, if the jury should find that deceased was the aggressor, threatened to kill the defendant, or cut his heart out, and made an attack on him with a knife, then the acts of the deceased were unlawful, and that, if there was a reasonable doubt on the point the jury should resolve it in favor of defendant. The evidence on the issue of self-defense was conflicting—that

---

of bystanders being that the defendant was the aggressor; that of the defendant being that the deceased was the aggressor. *Held,* that the charge was proper as presenting the two theories of the case in a manner not to be misunderstood by the jury, although the court's emphasis on the right of the deceased to act in self-defense in presenting the proposition reversed the normal way of stating the right, as depending on matters as they seemed from defendant's point of view.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 614, 616–620, 622–630; Dec. Dig. ☞300.]

Davidson, J., dissenting.

Appeal from District Court, Ellis County; F. L. Hawkins, Judge.

H. C. Ghent was convicted of manslaughter, and he appeals. Affirmed.

Farrar & McRae, of Waxahachie, and Wynne & Wynne and S. J. Osborne, all of Kaufman, for appellant. C. C. McDonald, Asst. Atty. Gen., for the State.

HARPER, J. Appellant was convicted of manslaughter, and his punishment assessed at two years' confinement in the state penitentiary.

The killing took place in Kaufman county, but the case was tried in Ellis county on a change of venue. The killing took place near what is known as Peele Town, in Kaufman county. W. T. and Jack Nash had owned a farm near this place. During the year 1912 the tenants on this farm received what is called "Whitecap notices" and left. At the request of the Messrs. Nash the sheriff of the county went down to investigate the matter, and, getting information that led him to believe that a son of B. J. Jernigan (the deceased) was mixed up in the matter, he called to see Mr. Jernigan, and says:

"I went down there to investigate, and I found out to my satisfaction that it was some of the boys there in the neighborhood that had done this; yet I was not in a position to prove it in court. I went into the field to where Mr. Jernigan was at work and talked to him about it. I told him that he had property there, and that the interest of the community was his interest, and he should help me eliminate that situation there, and his boys, if they got tangled up in the meshes of the law, it would be hard for them to get out. He asked me who it was, and I told him I did not care to tell him, that I was not in a position to put anybody in court about it, and I told him I just wanted that situation eliminated. He asked me whether his boy had anything to do with it, and I told him that I could not answer his question whether his boy had anything to do with it; that if I began to answer his questions he would finally ask me one that I could not answer; and he talked somewhat irritated because I would not answer his question. He did not seem to be in a very good humor when I left him."

Later W. T. and Jack Nash sold the land to some parties in Ellis county, and they placed E. K. Atwood (one of the owners) in charge thereof, and he had charge during the year 1913, and at the time the killing took place in January, 1914. Mr. Atwood testified that in December, 1913, he had some negro tenants on the place, and they were being molested and were being threatened, receiving Whitecap notices to leave the farm, and some did leave. He (Atwood) applied to W. T. and Jack Nash to aid him in getting a man to go to the farm and look after the matter. They recommended appellant, and he was employed. W. T. Nash testifies in regard to the matter as follows:

"I know the defendant, H. C. Ghent; have known him 15 years—10 or 15. I remember the circumstances of a report of Whitecapping and trouble down on the Atwood farm. I had owned that farm previous to that time, me and my family, and had sold it to Mr. Atwood and these other gentlemen. I had a conversation with Mr. Atwood in regard to employing some one to go down there on the part of Mr. Atwood and protect the negroes and look after the Whitecapping. The first conversation we had was with my brother, Jack Nash. My brother and me had a conversation with Mr. Ghent in regard to the matter. He asked him first if he would go, and he said he did not know, and he wanted to know what it would pay him. We told him it would pay him something more than he was getting. He said he was getting, I believe, $40 a month. We told him we thought these people would be willing to pay him possibly $75 a month, and we discussed whether he would go or not. He said if he could agree with them satisfactorily and pleasantly he would go. We told him, of course, that it was a pretty bad thing, that the year before that they had posted some notices on one of the cabins, and that I had to go down there and take the sheriff with me, and the sheriff went around in the community and talked to different people, and I said to some of the people at the store down there in a little crowd that had accumulated that I was running that place, had always run it, and treated them right, and anything I had they could get, and that I wanted to be neighborly, that I paid the big end of the taxes for that school; in fact, mentioned, 'You have the best country school in the county; this place largely supports it, and I want to get along with you people.' I told him they had posted these notices the year before, and I told him that I was going to protect the place if I had to go down there and sleep and stay there all the time; that it was a pretty bad community, and there were some bad men down there, and that it was a pretty hard job; that the year before I had taken the sheriff down there. In the conversation I mentioned the fact about going to see Mr. Jernigan. After my brother, Mr. Ghent, and I talked that night Mr. Atwood came to Kaufman, and we had Mr. Ghent in the barn, and I went and got Mr. Crane and brought him down there. Mr. Crane was at that time sheriff of Kaufman county; he had been sheriff for eight or ten years. My brother, Mr. Atwood, Mr. Ghent, Mr. Crane, and myself were all present at the conversation in the barn. We got Mr. Crane for the purpose of advising with Mr. Ghent. We told him that, as sheriff of the county, we wanted to consult with him in connection with employing Mr. Ghent to go down there and protect this property, and mentioned, of course, that he knew about this Whitecapping, and Mr. Crane said, 'Yes; I haven't been able to get anybody to handle the situation down there,' and we asked him what he thought about getting Ghent to go down there, and he said he thought he was the very man to handle it. He asked Mr. Ghent did he have a gun, and he said he wished he had a saddle gun for him—said, 'I wish I had my saddle gun to let you have;' and Ghent said that he had a gun; and we asked Mr. Crane to deputize him, and Mr.

Crane said that he could not do that, that he had all of the deputies that the law allowed him, but for him to go ahead and go armed; and he said that a man that would post Whitecap notices and explode dynamite would shoot you in the back; and he said, 'You watch him now;' and he said, 'There are some bad ones down there;' and we said, 'Can't you give him some authority;' and he said, 'Well, now, of course, I cannot deputize him, but I will take care of him about the guns;' and with that understanding he went down there and accepted this employment, and once or twice during that time while he was employed he came back and consulted Mr. Crane and consulted with us. I don't remember whether it was in that conversation or the other one we discussed with Mr. Ghent that we had gone down there and talked to Mr. Jernigan. Just before this employment of Mr. Ghent there had been a report to us about the Whitecapping and dynamiting of the place; Mr. Atwood called us up, and then we heard it too. I do not think Mr. Crane went into details about the conversation he had with Jernigan at the time Mr. Crane and me went down to see Jernigan; he just mentioned to Mr. Ghent that he had some trouble there the year before; that he went in the field and talked to Mr. Jernigan, and he became very enraged; he told him that he was sheriff of the county and expected to enforce the law, and that he was down there with Mr. Nash—that is the conversation that he related—that Mr. Nash wanted to be neighborly and get along with those people without any trouble, that he didn't want any trouble, and that if it was not cut out, if it happened again, he would have to arrest his boy. My recollection is that in that conversation Mr. Crane just said, 'And he is a bad one'—used an expression of that kind, 'He is a bad one;' I think Mr. Crane used that expression."

[1, 2] Jack Nash and E. K. Atwood testify, in substance, the same thing. The sheriff denies telling appellant that B. J. Jernigan was a bad man, but says he told him only of the conversation he had with Jernigan hereinbefore recited, and denies he agreed "to take care of appellant if he carried a pistol off the premises of Atwood." After this appellant went to the Atwood farm, and he contends he caused the arrest of some eight or ten men, charging them with the Whitecapping. It was shown that when the grand jury investigated the matter only one of the men arrested was indicted; the others being discharged. It was further shown that the man indicted by the grand jury was acquitted. This fact was shown by oral testimony. Appellant objected to it thus being shown, claiming that the record was the best evidence of such fact. In approving the bill the court says that, when the testimony of County Attorney Terry was objected to on this ground, "proof had been made before the witness John Terry was placed on the stand that the Whitecapping cases had been dismissed, all except one, and that case had been tried, and the defendant acquitted, without objection being made thereto." It is a correct proposition of law that, in so far as the acquittal of one was concerned, the record would have been the best evidence. But, where the grand jury fails and refuses to indict, there is no record made in the minutes of the court of such fact; so that the grand jury had failed and refused to indict could be proven by oral testimony alone. It is a rule of law well recognized that, where objection is made to testimony, a part of which is admissible and a part not, the objection is not good, but the objection must be directed specifically to that part which is inadmissible. The bill is as follows:

"After the said witness had testified that he was county attorney of Kaufman county, Tex., and that he had charge of the case against the Whitecappers in Kaufman county, Tex., he was asked: 'Q. What became of the Whitecapping cases?' To the question the defendant objected, and to the answer sought to be elicited from the said witness the defendant objected, because the testimony was irrelevant and immaterial, and the record of the cases from Kaufman county, Tex., would be the best evidence of what became of the cases. The said objections of the defendant, H. C. Ghent, were by the court overruled, and the witness permitted to state, and he did state, in the presence of the jury: 'A. Only one bill was returned out of the ten. The grand jury indicted one of them, and failed to return a bill against the other nine, and they were discharged on the failure of the grand jury to indict, and the one was tried and acquitted.' To which action of the court in permitting this evidence to go to the jury, over the objection of the defendant, the defendant excepted and objected, and he here and now objects and excepts, and tenders this, his bill of exception to said action, and asks that the same be approved as a part of the record in this cause."

It is thus seen the objection was urged to all the testimony, and, a portion of it being admissible, the court did not err in overruling the objection. In the case of Ortiz v. State, 151 S. W. 1056, Judge Davidson aptly states the rule:

"Where evidence is introduced over objection, some of which is admissible and some of which is on doubtful grounds, or which might be objectionable, it is the duty of the objector to specify in the bill the particular portion to which objection is urged"—citing Branch's Crim. Law, § 47; Payton v. State, 35 Tex. Cr. R. 510, 34 S. W. 615; Tubb v. State, 55 Tex. Cr. R. 623, 117 S. W. 858; Cabral v. State, 57 Tex. Cr. R. 304, 122 S. W. 872.

[3] It appears that after Mr. Ghent went to the Atwood farm some unknown parties visited the Atwood farm dressed in sheets, called Nick Edwards to the door, and handed him the following notice:

"Read and Go.

"Say, negroes, you had better move in the next three days *We have give you all fair warning.* We don't expect a negro to live on the Nash [Atwood] farm at all. We don't want to hurt you all, but you had damn sure better get off of that farm and stay off. Now, we don't want to have to tell you any more to move. This is our last warning."

Appellant offered this notice in evidence, and reserved a bill of exception to its exclusion. The court, in approving the bill, says he excluded the notice because deceased was not connected with it, and refers us to the statement of facts. The statement of facts shows that appellant was told by the sheriff that the year before he had reason to suspect deceased's son was connected with the Whitecapping in that community. It fur-

ther shows that appellant had seen the notice, and that Mr. Atwood told him:

"There was a man by the name of Jernigan, who had made some talk about this negro Nick Edwards, and told him he would give him $50 to stay there, and he bet him $50 more that he did not stay there; that if he went to sleep on that farm he would wake up in hell."

Appellant says Nick Edwards also told him about the matter, and he went to see Mr. Jernigan, and asked him if he had had that talk with this negro, and he said, "Yes; I had that talk with him," and deceased said, "God damn him, I am going to kill him for telling you." Appellant then recites what occurred, saying he said:

" 'No, Mr. Jernigan; there is no use in killing the negro for telling me, because he did not voluntarily tell me, because I went to him and asked him if he had had such a talk with him'—if Mr. Jernigan had had such a talk—and he told me that he had. Nick told me that he had; and I says, 'Mr. Jernigan, the negro is not to blame at all, because he would not have told me if I had not asked him the question,' and he said Edwards had told him, and says, 'Well, I won't bother them any more.' I said, 'All right, then Mr. Jernigan,' and I stayed there a few minutes, and he called a couple of negro boys that they had in the field there and asked them if he did not joke them sometimes, and he told these two negro boys what I was up there for, and said to them, 'I joke the boys a right smart,' and both of the boys said, 'Yes,' and I told Mr. Jernigan that I had to go back home, and he went around with me and asked me to go down to dinner with him. I went on back home, and I did not take dinner with him. We were friendly so far as I know."

This is as near as the record comes to connecting deceased with the delivery of the notice to Nick Edwards, and, as the court permitted Nick Edwards to testify fully in regard to the matter, we do not think he committed error in excluding the contents of the notice. The fact that Nick Edwards received a notice was permitted to be shown, and Nick was permitted to testify:

"I went to Mr. Atwood's place, in Kaufman county, from Ellis county. I moved from Ellis county to that place to be one of his tenants. I moved over there in October, about the latter part. I lived there during November, December, and January. I knew Mr. Ghent and Mr. Jernigan, the man that got killed. Before this killing I was living on the place keeping the house. Prior to this killing I received notices—Whitecap notices; it was at night when I received them. It was Saturday night before Christmas Eve. I had gone up there to a little town by the name of Peele Station to a little store to get me a little stuff, and I came on back home, and was sitting there by the fire between 10 and 11 o'clock, as near as I can remember—I do not know exactly; I did not have any time. A good many of us was sitting around the fire, and somebody walked up and holloaed, 'Hello!' and I had my baby in my lap, and I answered, and he says to me—says, 'Come out here.' I says, 'What do you want?' He says, 'It don't matter a damn what I want;' and I says, 'Come here,' when he spoke that way. Of course, I kind of commenced to feel dubious, and I says, 'I ain't going nowhere.' He says, 'If you don't come out here I will blow you up, God damn you;' and I says, 'Go blow me up, for I ain't coming.' At that time some of the boys— It was a dark ball, and he throwed it up against the wall, and it exploded, and he says, 'If you don't come we will blow you up.' One of the boys walked out on the front porch. On Sunday morning I comes to Ennis and goes to Mr. Atwood. I copied from that notice as near as I could, and when I went to Ennis I gave it to Mr. Atwood, and he read it, and asked me if I had an idea who wrote it, or who it was, and I told him that I thought I did. He asked me who, and I gave him the name of the parties I thought it was. He says, 'Well, you go ahead on up to my house and stay there with son, a colored boy, until after dinner, and I will see about this, and see about maybe.' That is the words he spoke to me. Previous to this time there was not any houses blowed up, but they set a charge or two close to my house, I suppose. The first two that they put out there there was not any sound; I could hear them. The last two that they put there about 100 yards from the house in the root of a red oak tree, and put two charges in the same hole, and I was standing on the porch when they went off. The first one that went off I was in the house, and walked out on the porch and seen the last one that went off. At the time I went down and reported this to Mr. Atwood there were some people from Ellis county, from where I was, tenants on the Atwood farm—Mrs. Dickson and her family. Some of the tenants had gone away at the time they began to blast. There was about two families moved out when they began to dynamite the place. I went to Ennis and told Mr. Atwood about this after I got the notice, and I then went back to the farm. After that I saw Mr. Jernigan, the man that was killed, and had a conversation with him in reference to dynamiting. He asked me after the people had gone, he asked me—he says, 'Nick, the rest of the negroes have left out down there,' and I told him, 'Yes,' and he says, 'Why don't you leave?' and I told him I owed Mr. Edwards some,' and he said he was going to have colored down there, and I thought if he was going to put colored down there I thought I would stay and pay him, and he says to me, 'It seems to me like that you put yourself up as a target trying to play bully,' and he says, 'We don't allow any bullies down here,' and he said, 'If any of the boys say anything to me, you treat them nice and go ahead and not try to play bully,' and walked on off. He told me in that same conversation he would bet me $50 I would not stay, and would give me $50 if I would stay. He said if I would stay down there that night one of these mornings I would wake up in hell; that is the way he spoke it. He was in earnest when he was talking then."

It was thus seen that every circumstance connected with the affair was admitted in evidence, except the contents of the notice, and Nick Edwards testified that:

"He told Mr. Atwood that he thought he knew who wrote the notice; that he told Mr. Atwood the name of the parties connected with the affair."

If deceased was one of the parties, or Nick Edwards thought he was, it could easily have been proven by him, for he says he told Mr. Atwood who they were, and, if it had been shown that deceased was one of them, then the contents of the notice would have been admissible.

[4] In a number of bills it is shown that R. E. Conner, S. K. Palmer, Lawrence Gillespie, Ed Moore, R. W. Pryor, John Brewer, Ed Martin, Bill Middleton, W. R. Crane, F. W. Henderson, J. S. Terry, Ed Hutcheson, and perhaps others were permitted to testify that they knew deceased, and knew his general reputation as a peaceable and law-abiding citizen, and that such reputation was

good. Appellant objected to this testimony, claiming that he had not attacked the reputation of deceased. If he had not, his contention would be correct that such testimony would be inadmissible. However, we are of the opinion that appellant had attacked the reputation of deceased in this respect. He himself testified that:

When he was talking with Atwood, Jack Nash, W. T. Nash, and Sheriff Crane, "Mr. Crane told me that it was a rough country in that neck of the woods, something about the words he used, 'in that neck of the woods,' and they told me about a fellow by the name of Jernigan that lived down there in that country, that the year before that there was some Whitecapping going on down there, and that his boy was implicated in the Whitecapping before, and him and Bud Nash went to see Jernigan to talk to him about the boy, and went out in the field where Jernigan was, and Jernigan got pretty raw, something about the words he used, pretty 'rough,' and he says, 'He is a bad man.' He says, 'I think he is,' and he says, 'You will have to watch him.' In that conversation Mr. Jack Nash told me that if I went down there that I would have to be awful careful; that they were liable to come on to me at any time, and if they did that they would hurt me; that this man Jernigan was one among as bad men as there were in that neck of the woods."

W. T. Nash testified as hereinbefore stated. Jack Nash testified he told appellant Jernigan, deceased, was a bad man, and that Jernigan was threatening the negroes, and other like statements. The evidence offered in behalf of defendant is replete with testimony that Jernigan was a bad and dangerous man, and the witnesses say they had so told the defendant. In addition to this defendant tried by circumstantial testimony to connect deceased with the Whitecapping that had been going on in that neighborhood. Under such circumstances we think it was permissible for the state, in rebuttal, to show that deceased was not a bad or dangerous man, was not the character of man who would engage in Whitecapping escapades, but, on the other hand, was a peaceable, law-abiding citizen. Appellant had raised the issue as to the character of deceased, and the state could meet and rebut it. In the case of Berry v. State, 163 S. W. 965, we had this question before us, and we there held:

"Of course, if appellant had not * * * directly nor indirectly attacked the reputation of deceased, it would not have been proper for the state to introduce such evidence. But when the defendant had raised that issue by the evidence adduced by him, * * * under all of our decisions, it was permissible for the state to introduce evidence to meet the proof of defendant, and show, if it could, that deceased was not a violent * * * and dangerous man, but * * * a peaceable, law-abiding citizen."

This disposes of all the bills of exception in the record, with the exception of the bill relating to the charge of the court. As appellant was found guilty of manslaughter, it is unnecessary to discuss those portions of the exception relating to charge on murder, and the exception to the charge on manslaughter is general in its terms, and without merit. Hendricks v. State, 154 S. W. 1005.

[5] On the issue of self-defense the court charged the jury:

"Upon the law of self-defense you are instructed that, when a person is unlawfully attacked by another, and there is created in the mind of the person so attacked a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to any means at his command to prevent his assailant from taking his life or from inflicting upon him any serious bodily injury, and it is not necessary that there should be actual danger, as a person has the right to defend his life or person from apparent danger as fully and to the same extent as he would had the danger been real, provided he acted upon a reasonable apprehension of danger as it appeared to him, viewed from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If you believe from the evidence that B. J. Jernigan at the time of the homicide made an unlawful attack upon the defendant with a knife, and that from his acts, or from his acts coupled with his words, it reasonably appeared to defendant, as viewed from his standpoint, that he was in danger of losing his life or suffering serious bodily injury at the hands of deceased, and that defendant shot and killed the deceased under such reasonable apprehension or fear of death or serious bodily injury, if any such apprehension he had, then you will find the defendant not guilty.

"In connection with the charge on self-defense you are instructed that, if you believe from the evidence that B. J. Jernigan was armed with a knife and had made an unlawful attack with it upon the defendant in such manner as was reasonably calculated to produce death or serious bodily injury, then the law presumes, and you will presume, that Jernigan intended to kill or seriously injure the defendant.

"You are further instructed that, if you believe from the evidence beyond a reasonable doubt that at the time the controversy arose between Jernigan and defendant, at the time of the homicide, that the defendant was the aggressor and rode his horse at or towards the said B. J. Jernigan, then the law would not require the said B. J. Jernigan to retreat; and, if you further believe from the evidence beyond a reasonable doubt that he took hold of the reins or bits of the horse to push him away from him (Jernigan), or that he made an assault on said defendant with his knife in order to repel the acts, if any, of said defendant, then you are instructed that such act or acts on the part of said Jernigan would not be unlawful, provided he used no more force than was necessary. On the other hand, you are instructed that, if you find from the evidence that said Jernigan was the aggressor, that is, if he threatened to kill the said defendant, or to cut his heart out, and made an attack upon him with a knife, then you are instructed that the acts of the said B. J. Jernigan would be unlawful; and, if you have a reasonable doubt upon this issue, it would be your duty to resolve it in favor of the defendant."

The latter paragraph of this charge is attacked in several particulars. In the first place it is contended that it impairs appellant's right of self-defense; does not charge the law of the case; abridges his right to defend his person; has no basis in the testimony; and charges from the standpoint of the dead man, and gives to the jury the dead man's right of self-defense, etc. If there is error in this paragraph, it may be said it is sufficiently complained of. This makes it

necessary to state the facts at the time of the killing. There were but four eyewitnesses, W. B. Michaelson, J. D. Warren, Dock Jernigan, and appellant. Michaelson testified:

That Jernigan was inside of his field, and witness was talking to him, when appellant rode up; that both he and deceased spoke to appellant, and he replied; that Jernigan then said: " 'Ghent, you have been rounding me up to Ed Hutch,' and he says, 'I want to round you up.' Ghent turned with his horse's head towards the fence and says, 'What is it?' He stopped when Jernigan spoke like he did; he was going west towards Red Bank. That was not the road that leads directly to Peele Lake, his ranch. Ghent turned with his horse's head towards the fence, when he stopped and says, 'What is it?' He says, 'You have been threatening to lock me up to Ed Hutch;' and Ghent says, 'God damn you, if you don't keep your mouth shut I will lock you up.' Jernigan says, 'You cannot lock me up;' and he says, 'If you will get down I will give you a good whipping.' Ghent says, 'I cover the ground I stand on.' They were cursing and abusing each other. I could not go over all the details. Jernigan says, 'I understand you have been in the penitentiary.' He says, 'I would like to know what you went to the penitentiary for;' and Mr. Ghent then made a razee at the fence to run through it or jump over it—I could not say which—but he made a razee at the fence. He was on his horse, and when he did that he was up against the wire, and Jernigan caught the horse right by the bits, up close to the mouth. I do not know whether he aimed to keep the horse back outside of the fence or what he did it for; I do not know anything about that; but Mr. Ghent ran his hand to his pistol, and Jernigan turned the horse loose, and was stepping back when Mr. Ghent shot him; he stepped back, my recollection is, three steps, when Mr. Ghent shot him."

J. D. Warren testifies, in substance, to the same state of facts, as does also the deceased's son, Dock Jernigan. The witnesses for the state say that deceased had a pocketknife in his hand whittling when appellant rode up; that he at no time attempted to use it.

Appellant testified in his own behalf, and said:

"When I rode up there Mr. Jernigan was over in the—he was in the middle of the road, or something near that. I was going very slow, and the words came from him, and I turned around. He was on the inside of the fence, and he says, 'You jacked me up the other day;' and he says, 'Now, I am going to jack you up.' He says, 'I want to tell you something right now; there is no God damned ex-convict can do anything with me;' and when he said that he was right next to the fence, and he caught my horse by the bridle reins and says, 'God damn you, I am going to cut your heart out,' and he commenced cutting at me with a knife, and the mare commenced jumping, and in the struggle I was scared and went for my gun—the mare jumping, when I jerked my gun out and shot, and when I shot the mare wheeled around, and the last I seen of Mr. Jernigan as the mare wheeled around he was going' backwards—stepping backwards. I shot Jernigan because I was scared; I was afraid that they were fixing to mob me; I thought they had a bunch up there to kill me, because I knew that I was in a bad country, and I did not know whether I had any friends in that part of the country or not, and they had told me that he was a bad man. At the time I shot him he was

cutting at me with a knife. I shot him to defend myself."

It is thus seen there is a direct conflict between appellant's testimony and that of three other eyewitnesses. He admits Jernigan was inside of the field, but says he advanced to the fence, caught his horse by the bridle, and commenced to cut at him, saying, "God damn you, I am going to cut your heart out." The state's case is that, when deceased remarked, "I would like to know what you went to the penitentiary for," appellant made an attempt as if to have his horse jump the fence, when deceased caught the horse by the bridle. Appellant then pulled his gun and shot deceased as he backed off. The court in the paragraph complained of merely presents the two theories of the case; that is, if appellant advanced on deceased, when he made the remark quoted, and Jernigan acts were done in defending against such an attack by' appellant, then appellant could not claim to have acted in self-defense. The court puts it in different language, but that is the plain meaning of the words used, and could be understood in no other way by the jury. It is true Jernigan was not on trial, and the question of whether or not he acted in self-defense is not an issue in the case; the issue being whether or not appellant acted in self-defense, or whether he first attacked deceased, and then deceased caught the bridle of the horse and cut at appellant, if he did do so. If appellant made the attack first, the acts of Jernigan, if he did those things, would not justify appellant in slaying the deceased. And, while that paragraph of the charge is inaptly worded, yet the court gives the converse of the proposition, and we do not think it could or was misunderstood by the jury. It would have been better to have used language instructing the jury that, if he committed the first overt act with the intention of bringing on the difficulty, he could not claim to have acted in self-defense, and then the converse of that proposition. However, this, in effect, is what the charge as given, when read with the whole charge on self-defense, does do, and is a direct application of the law to the two theories as presented by the testimony. As before stated, while probably inaptly worded, under the evidence adduced, it presents the issues in a way that the jury would clearly understand what was meant by the language used, and the criticisms of the charge present no error for which the case should be reversed.

The judgment is affirmed.

DAVIDSON, J. I cannot concur.

### On Motion for Rehearing.

HARPER, J. Appellant has filed a motion for rehearing in which he earnestly insists that we erred in holding that 'proof of the general reputation of deceased was admissible, contending that he had made no attack on deceased in that respect. If not, of course,

it would be error to admit evidence as to the general reputation of deceased. But is he correct in saying he made no attack on deceased as a peaceable, law-abiding ciitzen? If appellant was making no attack on the reputation of the deceased as a peaceable, law-abiding man, why does he testify that Sheriff Crane told him that "Jernigan [deceased] was a bad man, and you will have to watch him"; that Jack Nash told him "that this man Jernigan was one among as bad men as there was in that neck of the woods"; that when the sheriff had gone to see Jernigan the year before that Jernigan had got raw; and that if he (appellant) went down there he would have to watch Jernigan? Why does he introduce testimony of what he says Jernigan, deceased, said when he talked to him about what it was claimed Jernigan had said to the negro Nick Edwards, and Jernigan saying that he was going to kill Nick for telling him (appellant)? Why does he introduce Nick Edwards to prove that Jernigan had said to him, "Nick, we don't allow any bullies down here; it seems to me that you put yourself up as a target trying to play bully," and that he (Jernigan) would bet him $50 he would not stay on the farm, and would give him $50 if he did stay; that if he (Nick) did stay he would wake up in hell one of these mornings? Why did appellant introduce E. K. Atwood, W. T. Nash, and Jack Nash all as witnesses to prove that they had told him (appellant) that Jernigan was a dangerous and violent man, and have Mr. Jack Nash testify "that it was a dangerous country, a bad country, and that any man who would paste Whitecap notices and dynamite a man's property would shoot him in the back; that Sheriff Crane had said it was a hard country and a dangerous class of men who did these things, and had told appellant that Jernigan was a bad man"? Why bend all his energies on this trial to prove, circumstantially at least, that Jernigan was connected with the Whitecappers, if he was not attacking the character of Jernigan as a peaceable, law-abiding man? The record is replete with evidence of the character above stated, and it could not be and was not introduced for any purpose other than to cause the jury to think that Jernigan was a dangerous and violent man, and a violator of the law. If not, such evidence had no place in this record; for it was in no way connected with the circumstances of the killing other than to show the character of man appellant was dealing with at the time he shot him. To say that the appellant could make this character of attack on deceased's reputation, and the state could not meet it with legitimate evidence, is, to our mind, but to state an absurdity. Jernigan's mouth was closed by death, and to permit these men to testify that he was a dangerous man, a bad man, a violent man, and his neighbors, men who had known him for years, would not be permitted to testify as to the general char-

acter he had established in their midst, would not be just to the dead man. His life was as dear to him as is the liberty of appellant to him. Courts are organized and conducted that the truth may be known; the witnesses are introduced, and then the jury can determine whether or not those who said deceased was a bad man, a dangerous man, and a violent man, or those who said his general reputation was that of a peaceable, law-abiding citizen, are entitled to most credit. Appellant says this is tearing down the bulwarks of the law. But we hardly think so. This question was discussed in the case of Hysaw v. State, 155 S. W. 942, and it was held:

"We think that, where the appellant puts the reputation of the deceased in issue on this subject by evidence either of his general reputation to that effect, or by specific acts showing it, then it would be proper for the state to rebut this by showing that his reputation * * * was not as attempted to be shown by such evidence, but his character was that of a peaceable, quiet, and law-abiding man."

In Bullock v. State, 165 S. W. 200, this court said:

"Certainly, when an appellant is permitted to so attack a deceased, the state should then be permitted, if it could, to introduce proof to rebut such evidence. * * *. The state * * * unquestionably has the right to meet this proof by showing that the general reputation or character of a deceased was that of a quiet, peaceable, and law-abiding man, and not the reverse, as attempted to be shown by an appellant."

This question is also discussed in Johnson v. State, 167 S. W. 733, and Darnell v. State, 58 Tex. Cr. R. 594, and in both cases such testimony is held to be admissible, when the appellant injects into the case the issue of the character of deceased. This is not only the rule in this court, but such has been held to be the rule in civil cases by our Supreme Court in Tex. & Pac. Ry. v. Raney, 86 Tex. 363, 25 S. W. 11, and our Courts of Civil Appeals in Texas Cent. Ry. Co. v. Weideman, 62 S. W. 810. And not only is it the rule in this state in both civil and criminal courts, but it is the rule generally adhered to, as evidenced by the opinions in the following cases: Lewis v. State, 35 Ala. 380; People v. Ah Fat, 48 Cal. 61; Central Ry. Co. v. Dodd, 83 Ga. 507, 10 S. E. 206; Clackner v. State, 33 Ind. 412; State v. Fruge, 44 La. Ann. 165, 10 So. 621; Vernon v. Tucker, 30 Md. 456; Russell v. Coffin, 8 Pick. (Mass.) 143; People v. Hulse, 3 Hill (N. Y.) 309; State v. Roe, 12 Vt. 93; George v. Pilcher, 28 Grat. (Va.) 299, 26 Am. Rep. 350. When the appellant first offered evidence that deceased was a bad man and a violent man, then the state could meet that evidence by testimony tending to show that he was not a bad man and a dangerous man, but a peaceable, law-abiding citizen.

The only other question raised in appellant's motion for rehearing is that the court erred in his charge in presenting the law of self-defense. This was thoroughly discussed in the original opinion, and we do not

deem it necessary to do so again, as our opinion on that question is not changed. The court aptly presented both the theory of the defendant and the state, and told the jury the defendant should be given the benefit of a reasonable doubt on this issue.

The motion for rehearing is overruled.

DAVIDSON, J. (dissenting). It occurs to me this case ought not to have been affirmed, but reversed. As I see this record and understand it, the Whitecap notice, contained in a bill of exceptions and discussed in Judge HARPER'S original opinion, should have been admitted in evidence. Appellant was hired to go to the Nash or Atwood farm and take charge of it on account of the Whitecapping that was being done and threatened to be done to and with the tenants on that property. Appellant hesitated about going, and, among other things, the deceased was discussed, and appellant was informed that the deceased was a bad man, and he would have to watch him. Nick Edwards, a negro tenant on the farm, had been served with a Whitecap notice that he must move. The notice is set out in Judge HARPER'S opinion, and I do not care to repeat it. It shows on its face that Nick Edwards was required to leave, and leave promptly; otherwise there would be serious trouble in the very near future for him. This was communicated to appellant. The deceased, Jernigan, had had a talk with Edwards about moving, in which he informed Edwards, in substance, that he must get away, and challenged him to stay on the place, on pain of trouble. All this it seems was communicated to appellant. Some conversation came up between appellant and deceased about what appellant had said to some one else prior to the morning the parties met. Deceased mentioned something about this matter, and this brought up the trouble which ended in the killing. Deceased said that appellant had said things about him to a third party, and now deceased purposed to have something to say to appellant.

The facts are controverted as to who may have been in the wrong in the inception of the difficulty, but the issue of self-defense was in the case. The character of the deceased was sought to be made an issue in the case. The state introduced quite a lot of testimony showing he was a man of good reputation. Objection was urged to this on the ground appellant had not placed his reputation in evidence. Be that as it may, this Whitecapping notice was introducible for more reasons than one. The fact that Whitecapping was going on there was the reason why appellant was employed to be there. The deceased, Jernigan, was connected with this Whitecapping notice sufficiently to make it a part of the case, and it should have been introduced in evidence. It was also introducible for another reason. The reputation or standing and character of deceased got into the case. If he was connected—and the evidence indicates that he was—with the Whitecapping business, and especially the posting of this Whitecap notice, it would seriously impair, or tend to do so, his standing as a law-abiding citizen. It could not be well contended that a man who posted notices of that sort and threatened to kill his fellowman, who was trying to support his family as a laboring tenant, if he did not move from the farm, was a man of inoffensive disposition and a good man. It would indicate a disposition on the part of those who posted that notice of lawlessness and an utter disregard of the rights of his fellowman, and showed a heart fatally bent on mischief and regardless of social duty. It was therefore admissible: First, because it was a part of the case; it was at the bottom really of the trouble between the parties, deceased and defendant, and deceased was sufficiently connected with it to show that he had a hand in it either in the actual posting or as privy and accomplice to it. If he had been upon trial for posting that notice, with the evidence in this record against him, I do not believe this court would have reversed the judgment on the facts had he been convicted. It was also admissible as bearing upon his reputation and standing, as the whole matter grew out of this Whitecapping business. I do not care to follow this question further.

The court charged the jury:

"That, if you believe from the evidence beyond a reasonable doubt that at the time the controversy arose between Jernigan and defendant at the time of the homicide that the defendant was the aggressor and rode his horse at or towards the said B. J. Jernigan, then the law would not require the said B. J. Jernigan to retreat; and, if you further believe from the evidence beyond a reasonable doubt that he took hold of the reins or bits of the horse to push him away from him (Jernigan), or that he made an assault on said defendant with his knife in order to repel the acts, if any, of said defendant, then you are instructed that such act or acts on the part of said Jernigan would not be unlawful, provided he used no more force than was necessary."

This charge is subject to various objections. It is on the weight of evidence, and it reverses the rule of law in Texas, which is that a case is viewed from the defendant's standpoint, and not that of the state or the deceased. This charge tries the defendant from the theory that the deceased was being tried for an attack on appellant. Jernigan was dead. The issue was whether or not appellant had brought about an unlawful homicide, and, among other things, from his viewpoint that he was acting in self-defense. This charge authorizes the jury to try Jernigan from the standpoint and on the theory he had the right of self-defense, applying the rule of unnecessary force and an attack by defendant and the law of retreat as to Jernigan, and not the defendant. The rule has been fundamental in Texas without an exception, so far as I know, that when the accused is being tried for a homicide, the law does look at it, and the jury must regard it

from the standpoint of the defendant, and not that of the deceased or the state. This charge reverses that rule, and virtually informs the jury that they must try Jernigan from his standpoint of self-defense, as if he was acting in self-defense, and the defendant was not, and it tested appellant's right before the jury on the law of self-defense from the standpoint of the deceased. This charge is so obviously wrong that this judgment ought to have been reversed without discussion.

There are other questions in the case I do not purpose to discuss. This judgment ought to have been reversed, and the cause remanded.

---

⊂=>For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes