## Ernest Vickers v. The State.

### No. 6789. Decided May 10, 1922.

**1.—Murder—Continuance—Motion for New Trial.**

Where the State controverted the motion for new trial, on the ground of overruling an application for continuance, and attached an affidavit from the alleged absent witness denying that he would have testified as alleged, and showing that defendant intended to have him swear falsely, there was no error in overruling the motion for a new trial.

**2.—Same—Jury and Jury Law—Conscientious Scruples—Death Penalty.**

Where the juror on his voire dire answered that he could not inflict the death penalty in a proper case, there was no error in the action of the court in excusing him,

3.—Challenge For Cause—Peremptory Challenge.

Where it was not made to appear that the defendant had exhausted his peremptory challenges or that any objectionable juror served upon his case, there was no error in having overruled his challenges for cause.

4.—Same—Evidence—Dying Declarations—Predicate—Expert Witness.

Where the physician informed the injured party that in all probability his wound was a fatal one, and the injured party said he knew he was going to die, and a witness testified that said party was conscious and sane, this was a sufficient predicate to introduce his dying declarations. Following Morgan v. State, 54 Texas Crim. Rep., 542, and other cases; and it was not necessary that this should have taken place in the presence of defendant, nor that the witness who testified as to sanity was an expert. Following Lyles v. State, 48 Texas Crim. Rep., 119.

5.—Same—Evidence—Condition of Weapon Used.

Upon trial of murder there was no error in showing the condition of the pistol which the deceased had in his hand to show that he was shot through the hand ·by the defendant, to corroborate the truth of defendant's confession, and the statement of deceased.

6.—Same—Witness Under Rule—Rule Stated.

The enforcement of the rule as to keeping witnesses from hearing the testimony adduced on trial is largely within the discretion of the court, and no abuse being shown, there is no reversible error.

7.—Same—Examination of Witnesses—Repetition.

Where counsel for defendant had been given wide latitude in the cross-examination of a state's witness, there was no abuse of the court's discretion in declining to permit unnecessary repetition of what the witness had stated a number of times theretofore.

8.—Same—Evidence—Confession—Co-ercion—Conduct of District Attorney.

Where there was nothing in the record which would justify the conclusion that the jury was unauthorized in finding the confession to have been voluntarily made, this court will not interfere with the verdict of the jury finding defendant guilty, and the circumstance that the assistant district attorney permitted himself to be placed in the jail to find out the identity of a certain witness which the State afterwards used, there was no reversible error.

9.—Same—Evidence—Accomplice—Imputing Crime to Another.

If defendant desired to show that a certain state's witness and not the defendant committed the offense, he was bound by the ordinary rules of evidence, establishing his theory, and where his questions simply called for a conclusion of the witness, there was no error in sustaining an objection thereto.

10.—Same—Evidence—Contradiction of Witness—Predicate—Waiver.

While defendant was testifying in his own behalf, the State laid certain predicate for impeaching him, by asking if on a previous trial he had not sworn differently to what he was then testifying, and to introduce portions

of testimony of defendant on the former trial, after laying such predicate, there was no error; besides, the defendant waived the opportunity offered by the court to introduce any portion of the testimony which would have been pertinent to that introduced by the State.

### 11.—Same—Requested Charge—Practice in Trial Court.

Where the requested charge was inapplicable to the facts in one re-spect (the same having been withdrawn), and other portions thereof hav-ing been covered by the main charge, there was no reversible error in re-fusing same.

### 12.—Same—Evidence—Husband and Wife—Cross-examination.

Where the State's witness was asked upon cross-examination whether he had not told his wife that he had killed deceased, and denied that he had so told her, the court did not err in refusing to compel the wife to testify to such statement by her husband, as such would have been violative of Article 795 C. C. P. Following Pinckard v. State, 62 Texas Crim. Rey., 604.

### 13.—Same—Sufficiency of the Evidence—Death Penalty.

Where upon trial of murder, the evidence sustained the conviction in-flicting death penalty, there was no reversible error.

Appeal from the Criminal District Court of Tarrant. Tried below before the Honorable Geo. E. Hosey.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Callaway & Shead,* for appellant.—Cited cases in opinion.

*R. G. Hamilton,* Assistant Attorney General, for the State.

HAWKINS, Judge.—Appellant was convicted for the murder of one J. B. Loper, his punishment being assessed at death.

J. B. Loper was killed on the night of October 20, 1920. He was special officer for the Frisco Railroad, and left the Frisco Freight Office about eight or nine o'clock going towards the city of Fort Worth. A short time after he left shots were heard in what is known as the T. P. reservation, and Loper was found badly wounded. He was taken to the hospital and made a dying statement to the effect that as he was crossing the "reservation" a man came up to within eighteen or twenty feet of him and told him to stick his hands up, and that he (Loper) reached for his own gun and when he did this the man shot him twice. He described the man as being of slight build, dressed with a dark cap, dark coat and light trousers. Many months seem to have intervened before any definite information reached the officers as to the identity of the party committing the offense. Bennie Atkinson testified that at the time of the killing he was acquainted with appel-lant but knew him under the name of "Blackie" Kelly, and did not

know his name was Vickers; that appellant had supper with witness on the night of the killing at his mother's house; that after supper he and appellant drove around for a while in a car belonging to witness' mother; that appellant got out of the car about eight-thirty and said he was "going out to make some money, but did not say how;" that appellant had a pistol with him at that time. He next saw appellant about thirty or forty minutes later when he again came to witness' house; he came running in and told witness he had killed a man on the T. P. reservation; said he had told him "to throw his hands up and he failed to do it and he shot him." He requested witness to get some oil for him to clean his pistol which the witness did. He took two empty shells out of the gun. This witness said appellant had on a blue cap and blue serge suit but slipped on a pair of khaki trousers over the blue ones before he left his house the first time. Witness explains that he had never told anything about the occurrence because from what appellant told him he was afraid violence would be done him if he told what he knew. The State offered in evidence appellant's confession, which, omitting immaterial parts, was as follows:

"That evening about seven o'clock Bennie and I talked about making some money. I had my pistol, a 44-40 colt double action with me. He and I got in his car. I had my pistol loaded with 38-caliber winchester cartridges. Bennie and I drove on up town and then later we drove out South Main Street, passed the T & P Station and crossed the tracks just north of the T & P Roundhouse. I got out of the car and started out across the T P reservation following the trail in a south west direction. At the time I had on my coat, a brown checked cap and light-colored pants. After I had gone a short ways up the trail, I saw a man coming down the trail meeting me. When I had come to within about fifteen feet of him, I told him to "Stick em up" but he did not stick em up, but looked as if he was reaching for his gun. I, of course, already had my gun on him, and I fired at him three times and then ran back down the trail in the direction that I had come from. I heard his gun fire one time. I went back to where the RR tracks cross South Main Street just north of the T & P Roundhouse and caught a passenger coach that was being switched going east. I rode the passenger coach until it got to the viaduct on Boaz Street, and I jumped off and went back to Bennie Atkinson's house. Bennie had driven on south when I got out of the car on South Main Street and was supposed to wait for me on Railroad Avenue, but when I got back to his house after the shooting he was already there. I went on in and told him all about it there at that time."

Witness Lewis testified that he was driving in his car near the T. P. reservation and heard the shots and immediately after saw a man running across the road direct in front of his car; the man had on a blue cap, dark coat and lighter colored trousers; that as he passed

in front of his automobile and struck the railroad track he half turned toward the car and witness had a clear view of his face and that appellant resembled the man he saw. Appellant testified denying the killing, and claimed that at the time it occurred he was in his room with one Clarence McCorley; that he had seen Bennie Atkinson that night and that Bennie had his (appellant's) pistol; that the next morning Atkinson told him that he (Atkinson) had a "shooting scrape out there the night before" and pulled the pistol out from under the bath tub and took some empty shells out of it and give him (appellant) the gun. We deem it unnecessary to make a further detailed statement of the facts. Some of them will be disclosed in the discussion of questions raised by bills of exception.

Continuance was applied for on account of the absence of Clarence McCorley. It was alleged that the witness would testify that he was in the city of Fort Worth the night of the killing, and spent the night with appellant, and was with him at a rooming house at the time deceased was killed upon the T. P. reservation. The action of the court in denying the continuance was one ground upon which motion for new trial was urged. The state controverted the motion and attached an affidavit from the witness denying that he would have testified as alleged, but asserting that he was not in Fort Worth when the killing occurred but was in the State of New York. The affidavit further states that appellant had requested the witness to swear that he was with appellant upon the night of the killing, but witness had declined to do so. No error was committed in refusing the continuance.

J. A. Gibbons, a venireman, answered that he had conscientious scruples with reference to inflicting the death penalty. The court asked him if the severity of the crime would affect his views, to which he replied there might be come cases in which he could do it; the court then asked if a man killed another in cold blood without any reason would he inflict the death penalty, to which he answered "I don't hardly think I could," whereupon he was excused. In view of the character of the instant case it would have been manifestly unfair to the State to have retained the juror. The court ruled correctly in excusing him. Veniremen Wetsett and Crawford were challenged for cause by appellant, and upon the challenge being overruled were challenged by him peremptorily. Venireman Evans was challenged for cause, which was overruled. It is not shown that he served on the jury. Objections were made to certain questions propounded by the State to venireman Moreland. The State challenged him peremptorily. It is not necessary to determine whether the court was in error in his rulings with reference to the last four named veniremen. If he was, appellant does not bring himself within the rule whereby it would avail him. It is not made to appear that he exhausted his peremptory challenges, or that any objectionable juror served upon the case. (Sections 642, 543, Branch's Ann. P. C., pp. 278, 279, 280).

Over the objections of appellant (Bill No. 7) the doctor was permitted to testify that he discussed the seriousness of his wound with Mr. Loper, and told him in all probability it was a fatal one. W. H. Tolbert testified to a dying declaration made by Loper. As a predicate therefor the witness said Loper told him he knew he was going to die, and requested witness to send for Loper's family; that Loper was conscious, talked in a perfectly rational manner, and was sane. The only objections presented by the bill to the witness' statement that Loper was conscious and sane in such a way as to be considered are as being a conclusion, and because he was not an expert. Before the State could offer the statement of deceased as a dying declaration it was necessary to show it was made when the declarant was conscious of approaching death. To do this it was pertinent to show that the doctor had advised him as to the fatal character of his wound. Morgan v. State, 54 Texas Crim. Rep., 542; Douglass v. State, 58 Texas Crim. Rep., 122, 124 S. W. Rep., 937. That the information was imparted to the wounded man out of the presence of appellant does not render proof of it inadmissible. It would be a rare case indeed where it could be done in his presence. Neither is it required that a witness be an expert to testify to the consciousness or sanity of one making the statement. Any witness present at the time may testify to such matters, subject to cross-examination as to his means of knowledge. Lyles v. State, 48 Texas Crim. Rep., 119.

In his dying declaration deceased stated that when the party who shot him got within a short distance of him he told him to stick his hands up, and deceased reached for his own gun and when he did this the man shot him. Appellant's confession is practically to the same effect. When deceased's pistol was found the guard was mashed in against the trigger, and among other wounds a shot had gone through his right hand. This and the condition of his pistol indicated that one shot from the robber had struck the pistol of deceased. Witness McKinney testified that at the scene of the shooting he found the handles of a pistol. The wife of deceased identified his pistol and testified that the last time she saw it prior to the killing the handles were on it. A son of deceased placed the handles which had been found by McKinney on his father's pistol, and testified that they fit the same. The testimony of McKinney, and of the wife and son of deceased was objected to by appellant as shown in his bills of exception numbers 8, 10 and 11. We are unable to discover any error in the admission of this testimony. It tended to corroborate not only the statement of deceased in his dying declaration, but also to show the truth of appellant's confession, and to throw light upon the actual happenings at the time of the killing.

The witnesses had been placed under the rule. When Charles Holland was called to testify by the State appellant objected because he had been in the courtroom and had heard the evidence of some of the

other witnesses. It appears that in some way Holland's name was not called at the time the witnesses were sworn, but the State's attorney thought he had been sworn and had gone out with the other witnesses. When called to testify it was discovered that he had not been sworn, whereupon he was sworn by the court and was permitted to testify. Matters of this kind are almost exclusively within the discretion of the trial judge, and the bill of exception shows no abuse of such discretion in this instance. Section 344, p. 197, Branch's Ann. P. C.

After Atkinson had testified that the night deceased was killed appellant told him he "had killed a man," and that it was some time after the killing before witness told the officers because he was afraid of appellant, he was asked what words appellant used that scared him; objection was interposed and sustained on the ground that he had already answered this question a number of times. An examination of the statement of facts reveals that this witness upon cross-examination had several times explained that he did not tell the officers what he knew because he was afraid to say anything for the reason that appellant had told him "if anybody ever turned him up for anything he had done, that if he (appellant) did not get them his brother would." counsel for appellant seems to have been given wide latitude in the cross-examination of this witness, and properly so, as his attitude before the jury was of such a character as to subject him to suspicion, but there was no abuse of the court's discretion in declining to permit unnecessary repetitions of what the witness had stated a number of times theretofore.

Appellant resisted the introduction of his confession on the ground that it was not voluntarily made; that he had been improperly induced and coerced to make the same. Matters bearing upon this issue are presented in bills of exception numbers 13B, 14, 15, 18, 20, 22 and 23. Some of the bills are incomplete and not in proper form, and we might decline to consider them for this reason, but as this question is an important one and vital to appellant's interest, we will group the bills and consider them together. The first information the officers at Fort Worth had connecting appellant with the killing of J. B. Loper came from Bennie Atkinson. He did not know appellant as Vickers, but only knew the man about whom he gave the information as "Blackie" Kelly. He told the officers he understood the man he knew as Kelly lived near Belton, and had some relatives there who were blacksmiths. The Fort Worth officers went to Belton inquiring for "Blackie" Kelly, and were informed by the Belton officers that they knew of no family by the name of Kelly suiting the description, but from all the information the Forth Worth officers had the Belton officers thought it suited appellant who at that time was in jail in Belton, on what charge is not disclosed from the record. The Fort Worth officers were not satisfied to proceed upon the information received from Atkinson until they were convinced that "Blackie" Kelly and Ernest Vickers were

one and the same person. In order that they might know this Jesse E. Martin, the Assistant District Attorney and Mr. Rhodes, the Fort Worth detective, took Atkinson to Belton. Martin was not satisfied to act upon Atkinson's identification, but wanted to see for himself whether Vickers and Atkinson were acquainted with one another. Vanoy, a deputy sheriff at Belton, placed Martin and Atkinson in jail as automobile thieves. It was at once apparent that Vickers and Atkinson were acquainted and appellant asked Martin what he was in jail for. According to Martin's testimony he declined to answer, whereupon appellant told him he could have confidence in him (appellant), and that if he had any doubt about it Atkinson could tell him (Martin) that "Blackie" was all right. In order that there may be no misapprehension as to how what occurred in the jail at Belton got into the record we would observe here that the whole matter was developed by appellant and not the State. After Martin became convinced that appellant was the same man who had been known to Atkinson in Fort Worth as "Blackie Kelly" Martin and Atkinson were taken out of jail and appellant afterwards brought to the district attorney's office in Belton. He was there informed by Martin that he was the Assistant District Attorney at Fort Worth and that Mr. Rhodes was a detective from the same place. Appellant was taken to Fort Worth that night in company with officers Vanoy, Rhodes, Martin and the witness Atkinson. Appellant testified that Martin told him while he was in jail in Belton that he (Martin) was an automobile thief, and that after he was taken to the district attorney's office Martin also told him that "they had the goods on him and that he might as well come across and tell the truth or they would 'go to the creek' with him." Appellant also claimed that the officers having him in charge all the way to Fort Worth were in various ways trying to induce him to make a statement, and that after they got to Fort Worth the confession introduced in evidence was written out by Martin and that he was forced to sign the same by Rhodes who hit him over the head with a pistol. All of the matters testified to by appellant which would indicate that any improper advantage was taken of him, or that he was coerced in any way, or induced to make the statement, were denied by Martin and the other witnesses. Vanoy and Rhodes testified that at some point on the trip from Belton to Fort Forth they told appellant that it looked pretty bad for him, and if they were in his place they would tell the truth about it. After they left Cleburne on their journey appellant told Vanoy that he would tell the truth about it, and asked Vanoy to call Rhodes and Martin back to where Vanoy and appellant were seated. When Martin and Rhodes went back appellant signified his willingness to tell them about it, but Martin declined to talk to him at that time, telling him to wait until they got to Fort Worth. After reaching Fort Worth appellant was taken to the district attorney's office, properly warned and made the confession introduced in

evidence by the State.  On the issue raised by appellant's evidence the court instructed the jury that they could not consider such confession unless they found from the evidence beyond a reasonable doubt that it was made voluntarily and without being induced by any threats or any promise of assistance.  The finding of the jury upon controverted questions of fact are binding upon us.  We find nothing in the record which would justify the conclusion that the jury was unauthorized in finding the confession to have been voluntarily made.  Upon the conceded fact that the assistant district attorney permitted himself to be placed in jail at Belton with the witness Atkinson, we do not regard as a circumstance upon which could be based any well founded objection to the confession.  Nothing was said or done by Martin while observing the conduct of Atkinson and appellant toward one another another while in jail that can in any way be regarded as a threat, or improper conduct calculated to induce appellant to have made the subsequent confession.  To us it appears to have been a commendable desire on the part of the officers to satisfy their own minds, independent of the statement of Atkinson, that appellant under the name of "Blackie" Kelly had prior to that time known Atkinson, and was the man they were seeking before proceeding further against him upon so serious a charge as that of murder.

We have examined appellant's bill of exceptions 13, 16 and 17 and are of opinion they present no error.  We do not deem it necessary to discuss them at length.

It appears that while officer Vanoy was upon the witness stand he was asked the following question by counsel for appellant:

"You wanted to file a complaint against Atkinson, didn't you, and in looking up the case against the defendant did you not gather evidence pointing to Bennie Atkinson too, which showed his connection with this offense?"

Objection to this question was sustained.  Appellant's bill shows that if permitted the witness would have answered the question in the affirmative.  This testimony appears to have been offered by appellant for the purpose of showing that evidence pointing to the guilt of Atkinson was discovered, it being appellant's theory that Atkinson was the man who committed the offense.  The action of the court in declining to permit Vanoy to answer the question was not error.  If appellant desired to show that Atkinson and not appellant committed the murder he was bound by the ordinary rules of evidence in establishing his theory.  The question simply called for the conclusion of the witness and not for the statement of any fact pointing to Atkinson's guilt.

Bill of exception number 24 reflects the following proceedings. While appellant was testifying in his own behalf the State laid certain predicates for impeaching him, by asking if on a previous trial he had not sworn differently to what he was then testifying.  Follow-

ing the predicate the State introduced certain portions of the testimony of appellant on the former trial. After this it appears from the bill that both counsel for the State and for appellant agreed that the entire testimony given by appellant on the former trial might be considered in evidence, but it was never read to the jury, and only that portion went to the jury which the State had offered for impeachment. After the court had prepared his charge and appellant had prepared his special charges counsel for the State made a motion that all of appellant's testimony on the former trial except that offered for impeachment be withdrawn from the record for the reason that the State did not care to offer any other part thereof. The court withdrew from the record all of appellant's testimony save that introduced by the State for impeachment purposes, but advised both the State and appellant that they might reopen the case if they desired and introduce any particular portion of it if they saw fit to do so. Appellant excepted to this action of the Court. If any part of the former testimony of appellant was upon the same subject and related to the same matters which had been offered by the State to impeach the present testimony of appellant it was permissible for appellant to have introduced the same, but after such permission was tendered by the court no part thereof was offered by appellant and the bill therefore presents no error. Only that part of the testimony on the former trial was admissible which may have been pertinent to the impeaching statements read by the State. It appears from the bill that counsel for appellant waived the opportunity offered by the court to introduce any portion of the testimony which would have been pertinent to that introduced by the State.

Bill of exception numbers 25, 26, 27 and 28 relate to certain special charges requested by appellant and which were refused by the court. In so far as the same were applicable they had already been covered by the main charge and the refusal presents no error. The one presented in Bill 28 related to the testimony withdrawn from the record and heretofore discussed in connection with bill of exception 24. If the entire testimony of appellant on the former trial had remained in the record the charge refused by the court might have been pertinent but it having been properly withdrawn it was not incumbent upon the trial judge to give the charge relative thereto.

Bennie Atkinson was asked upon cross-examination, in effect, if he had not told his wife that he had killed deceased. He denied that he had so told her. Appellant called Mrs. Bennie Atkinson as a witness and it developed that she and Atkinson had married in 1917 but were divorced in June or July 1920; that at the time of the conversation inquired about they were not married, but he was again going with her and they were expecting to remarry. They were remarried in January 1921, and were husband and wife at the time Mrs. Atkinson was called as a witness by appellant, but she was not living with

him at that time. She refused to testify, giving as her reason that Atkinson was her husband. The court declined to compel her to give evidence. Appellant excepted on the ground that at the time of the conversation with Atkinson she was not his wife, and was not living with him at the time of the trial, and that it could not be claimed as a confidential communication. If compelled to do so the witness would have testified that shortly after the killing of Loper, Atkinson came to her house one time when he was intoxicated and said he "had killed a man," but she told him he was drunk or crazy; that he went away; that she saw him again the next morning when he was sober and asked him "if he had killed Loper" to which he replied "No, he had not done it, but that he knew the fellow that did." Upon being asked by her who it was he said "Well, I will never tell." This testimony could have been admissible, if at all, for two purposes only: first, for the purpose of impeaching Bennie Atkinson when he denied having told his wife that he had killed deceased; second, for the purpose of showing either that Bennie Atkinson alone was responsible for the death of deceased and that appellant was entirely innocent, or that Atkinson was an accomplice to the killing. Can the wife be called to give testimony the effect and purpose of which is to impeach her husband by having her testify to contradictory statements made to her at a prior time when they were not married? The case of Roach v. State, 41 Texas, 261, is very much in point. A State's witness in that case was asked if she had not made certain statements about the case before her marriage to the party who was then her husband. Afterwards the husband was introduced by the defendant to prove the declarations made to him by her before their marriage. The evidence was excluded because a proper predicate had not been laid, but the court in commenting on it used the following language:

"It was also properly excluded for the reason that the witnesses sustained to each other the relation of husband and wife and it made no difference at what time the relation commenced."

The opinion in Clubb v. State, 14 Texas Crim. App., 192, is not in conflict with the Roach case, but expressly affirms the doctrine therein laid down. This doctrine was reaffirmed in Norwood v. State, 80 Texas Crim. Rep., 564. Article 795 C. C. P. provides:

"The husband and wife may, in all criminal actions, be witnesses for each other; but they shall in no case testify against each other, except in a criminal prosecution for an offense committed by one against the other."

If one spouse can not be called to impeach the other as to a contradictory statement, it would seem useless to discuss the further proposition as to whether one might be permitted to testify to facts against the other which might subject him or her to a criminal prosecution. The proposition here under discussion is not in conflict with the rule

laid down in Dungan v. State, 39 Texas Crim. Rep., 118; Bluman v. State, 33 Texas Crim. Rep., 58 or Hardin v. State, 51 Texas Crim. Rep., 559. The doctrine in those cases is that a wife is a competent witness against a co-defendant where the husband admits his guilt and goes upon the stand and freely testifies either as a witness for the State, as in the Bluman case, or as a witness for the defendant, as in the Hardin case, because in such cases one cannot be said to be testifying against the other. Such is not the case here. The record fails to show that Atkinson had ever been indicted for killing deceased or that he testified under a promise of immunity from the State. He at all times earnestly denied that he was in many manner criminally connected with the killing, either as a principal or an accomplice, and had denied making the statement to his wife indicating that he might be guilty of such offense. To have compelled the wife to testify under such circumstances would in our opinion have been violative of Article 795 C. C. P. (supra) and of every reason of public policy which excludes the wife from testifying against the husband. Greenleaf on Evidence, 15 Ed., paragraphs 334, 335; Jones' Commentaries on Evidence, Vol. 4, page 401; Wharton's Criminal Evidence, Vol. 1, page 812, paragraph 396; Pinckard v. State, 62 Texas Crim. Rep., 604. From the latter case we take the following quotation:

"It does not appear from the record that Tom Pinckard had ever been indicted or charged with such offense except that such appears from the questions propounded by defendant, and the witness Pinckard nor his wife could not be compelled to furnish evidence upon which an independent criminal prosecution might be based."

If the statement of Mrs. Atkinson charged to have been made by her husband at the time he was intoxicated should be received, and his recantation the next morning while sober be disregarded, it would have furnished evidence or information upon which a prosecution against Atkinson might have been based. For the reasons stated we are of opinion the court committed no error in declining to compel Mrs. Atkinson to testify.

The record shows a killing committed in an effort to perpetrate robbery. There is no palliation for such an act, and the jury were justified in the verdict inflicting the extreme penalty.

No errors appearing in the record the judgment must be affirmed.

*Affirmed.*

[Rehearing denied June, 1922.]