### F. E. (PAT) DENSON V. THE STATE.

No. 10610. Delivered June 8, 1927.

Rehearing denied October 26, 1927.

**1.—Murder—Dying Declarations—Predicate Sufficient—Properly Admitted in Evidence.**

Where, on a trial for murder, the mother of the deceased testified that deceased told her immediately after the shooting that he was going to die, that he fully realized his condition at the time the statement was made, which was about 3 o'clock in the afternoon, prior to his death, which occurred between 11 and 12 o'clock that night; this was a sufficient predicate to authorize the admission in evidence of statements of deceased, which were reduced to writing.

**2. — Same — Dying Declaration — Non-Expert Testimony — Proper on Predicate.**

It is not required that a witness be an expert to testify to the consciousness or sanity of one making a dying declaration. Any witness present may testify to such matters, subject to cross-examination as to means of knowledge. See Lyles v. State, 48 Tex. Crim. Rep. 119, and other cases cited.

**3.—Same—Proof of Predicate—When Conflicting—Questions for Jury.**

Where the testimony offered on the predicate is conflicting as to deceased's mental status when the declaration was made, this raises a question of fact, which should be submitted to the jury, with the instruction that if they found that the deceased was not rational at the time, or if they entertained a reasonable doubt thereof, then they must not consider for any purpose the purported dying declaration.

**4.—Same—Dying Declaration—What Is Admissible—Rule Stated.**

The rule is well settled that nothing is admissible in a dying declaration that would not be admissible had the declarant been sworn, and was testifying as a witness. See Roberts v. State, 5 Tex. Crim. App. 141, and other cases cited.

**5.—Same—General Reputation—Of Deceased—When Admissible.**

Where communicated threats are shown, under Art. 1255, P. C., 1925, it is permissible for the state to prove the general character of the deceased. By the terms of the above statute the proof of communicated threats puts the general character of the deceased in issue. See Berry v. State, 7 Tex. Crim. App. 203, and other cases cited.

**6.—Same—Evidence—Of Conspiracy—Properly Admitted.**

Where the theory of the state, supported by testimony, was that appellant, his grandfather, father and brothers had congregated in the town of Spur for the purpose of bringing about a difficulty with the Brawleys, there was no error in admitting testimony that some ten minutes after the shooting of deceased by appellant, and in close proximity to it, that Hugh Denson, brother of the appellant, shot at J. A. Brawley, brother of deceased, four times.

ON REHEARING.

**7.—Same — General Reputation of Deceased — When Admissible — Rule Stated.**

Where proof of communicated threats are shown, under Art. 1258, P. C. of 1925, it shall be competent to introduce evidence of the general character of the deceased. "Such evidence *shall extend only to whether the deceased was a man of violent or dangerous character, or a man of kind and unoffensive disposition, or whether he was a person as might reasonably be expected to execute a threat made.* The inquiry of the state should be limited to the terms of the statute, as above set out. Distinguishing Plasters v. State, 1 Tex. Crim. App. 673, 683, and other cases cited in opinion on rehearing.

**8.—Same—Bill of Exception—Incomplete—Presents No Error.**

Where appellant specifically and pointedly objects to the introduction of evidence as to the general reputation of the deceased, because appellant had not put such reputation in issue, this court construes such bill as being directed to the admissibility of any evidence of deceased's character and not to the mere form of the question or answer that the trial court was called upon to rule.

Appeal from the District Court of Baylor County, on a change of venue from Dickens County.

Tried below before the Hon. J. H. Milam, Judge.

Appeal from a conviction of murder, penalty six years in the penitentiary.

The opinion states the case.

*Murchison & Davis* of Haskell; *Joe A. Wheat* of Seymour, and *W. D. Wilson* of Spur, for appellant.

*Sam D. Stinson,* State's Attorney, and *Robert M. Lyles,* Assistant State's Attorney, for the State.

HAWKINS, JUDGE.—Conviction is for murder, punishment being six years in the penitentiary.

Appellant shot and killed Edgar Brawley about eleven o'clock on Sunday morning in the town of Spur. The day before in the same town deceased and his father (J. A. Brawley) had a fight with Carl Denson, a brother of appellant, in which Carl was severely cut with a knife by deceased. Carl was taken to the sanitarium to have his wounds dressed; they were severe but proved to be not serious. Appellant was not in town when the fight occurred, but reached there and learned of it about an hour later. He went to the sanitarium to see Carl, who told him that J. A. Brawley had held him (Carl) while deceased had cut him. It was in evidence that someone informed deceased after the difficulty Saturday afternoon that appellant was in town, whereupon deceased said, "I don't care if he is. If I see him any more I am going to burn him down, and the next time it won't be with a knife, either." This threat was communicated to appellant. Before leaving for home on Saturday afternoon deceased bought a pistol. It was in evidence from J. A. Brawley and his wife that neither of them knew deceased had a pistol until they reached home, when Mrs. Brawley took it from deceased and locked it up, it being their contention that neither deceased nor any of the other Brawleys were armed at the time of the killing. Appellant went to his home on Saturday afternoon, some ten miles in the country. He returned to Spur on Sunday morning about ten o'clock giving as his reason that he did not know how severely Carl had been injured and came in to ascertain about it, and that having been informed the day before of the threat made against him by the deceased appellant brought his pistol for protection in the event he was attacked. Appellant visited the sanitarium and found Carl out in front on the sidewalk. They came to the business part of town together. J. A. Brawley, his wife, deceased and another son, Archie, came into Spur about eleven o'clock on Sunday. The killing occurred about twenty minutes after they reached town. It was in evidence from J. A. Brawley that as they came in to town they passed between the National Bank building and the Bryant Link store, where they turned south; that as they came by there he saw "Old Man Denson" (the grandfather of appellant, and who is spoken of in the record only as "Old Man Denson," and therefore it is necessary that we so designate him), L. Denson, Carl Denson, Hugh Denson, Charlie Denson and appellant. It is shown by the record that Charlie Denson is appellant's brother, L. Denson a brother, Hugh Denson an uncle. J. A. Brawley

said they turned south and went to the Carraway garage, where they put up their car. The witness testified that he saw the Densons come down the west side of the street toward the garage, but that Carl was not in the bunch at that time; that they came down the street to the corner, right across from the garage, and that witness and his party went up the street to the Sullivan store, and that the Densons followed them back up the street on the opposite side; that at the time appellant and the rest of them were across from the garage appellant was looking around over that way; that when they got up to the corner Old Man Denson got in the car and L. Denson started north toward the sanitarium; that the others crossed over and followed along behind the Brawleys. It is admitted by appellant that he and Carl Denson went to the Carraway garage. The purpose of the visit, according to his testimony, being that Carl Denson had been taking some purgative medicine and went there to use a toilet. He denies that he saw the Brawleys or knew that they were in town. After the Brawleys went into the Sullivan store the evidence is somewhat conflicting as to the movements of the other parties. The testimony of the Brawleys is to the effect that while they were in the store, appellant was seen to approach the front part of the store and look in through the glass window and immediately leave; that J. A. Brawley and deceased then came out of the Sullivan store, went west to the corner of the block and around back of the stores and came in at the back door of a bakery which adjoined the Sullivan store; that J. A. Brawley left deceased in the back end of the bakery and came out and about the time he reached the front of the Sullivan store again he saw appellant go in the front door of the bakery. It was his contention that he and his son had gone around and come in at the back of the bakery in order to get away from the Densons. Appellant's version of the matter is that he went to Sullivan's store for the purpose of asking Mr. Sullivan about some cottonseed and did not know until he reached that point that the Brawleys were in the store or in town, and that as he looked into the store, J. A. Brawley came toward the front of the store and that he, appellant immediately left and went into the front of the bakery for the purpose of getting away from the Brawleys and avoiding trouble. It was in evidence from parties who were working in the bakery that deceased and his father did not come in at the back door of the bakery and that J. A. Brawley was not seen by them in the bakery at any time that morning, but that deceased came in through the front door, passed through the partition door and

through the back of the bakery toward the back door, and that in a minute or two appellant also came in at the front door and passed through the front part of the bakery into the rear part and fired two shots toward the back door and then passed out the back door and fired another shot; a witness who was in the back of the bakery and testified to these movements, further said that from his position he could not see the back door at the time of the shooting and did not see deceased. It was the contention of the state that the movements of the Brawleys and especially of the deceased was to avoid a meeting with the Densons. On the other hand, it was the contention of appellant that his movements were brought about by a desire to avoid a meeting with the Brawleys. It was evidently the contention of the state that appellant had seen deceased go into the restaurant and immediately followed him in there; on the other hand, it was appellant's contention that he thought he had seen deceased in the Sullivan store and that as he passed through the partition door of the bakery he saw deceased coming in the back door of the restaurant and having in mind the threats which had been made by deceased the day before and knowing that he had purchased a pistol he (appellant) began firing, believing that deceased was about to make an attack. Appellant says he fired one shot at deceased from back of the restaurant and while deceased was at the back door and that then hearing some one at the front part of the restaurant, he thought it was J. A. Brawley coming in after him, at which time he again saw deceased near the corner of the building and fired at him again, and that when he reached that point deceased was at the other corner of the building at which time appellant fired at him the third time. He claims that at the time he fired the third shot deceased had a pistol in his hand which he thought deceased dropped; that appellant immediately crossed the street and got in his cousin's, Hugh Denson, car and requested his cousin to take him to the sheriff's home.

Appellant complains of the admission in evidence of the dying declaration, the objections, among others, being that no statutory predicate had been laid for its introduction, that it was given in answer to leading questions, and did not show that deceased had no hope of recovery. The only witness examined on the predicate was Mrs. J. A. Brawley, the mother of deceased. She testified that he told her immediately after the shooting that he was going to die, that he fully realized his condition at the time the statement was made about three o'clock in the afternoon; that he was rational and knew what he was doing and

spoke of wanting a preacher to pray for him so he could die with a clear conscience, that he died between eleven and twelve o'clock that night. This witness testified that she asked deceased questions and Dr. Morris wrote down the answers. In our opinion the bill does not disclose that the questions asked were such as rendered the statement inadmissible, nor that deceased was not rational when the statement was made. It is not required that a witness be an expert to testify to the consciousness or sanity of one making a dying declaration. Any witness present may testify to such matters subject to cross examination as to means of knowledge. Lyles v. State, 48 Tex. Crim. Rep. 119, 86 S. W. 763; Vickers v. State, 92 Tex. Crim. Rep. 182, 242 S. W. 1032. The ruling of the trial court must be appraised by the way the matter appears at the time he is called upon to act. Mrs. Brawley may have been mistaken as to deceased being rational but the court was not in possession of other information upon that point when called upon to rule. Later appellant called the physicians. They were in attendance upon the court as witnesses and he might have called them at the time the predicate was being tested by the court. When they were called Dr. Morris testified that he could not say postively that deceased was or was not rational when the declaration was made but thought it doubtful if he was rational. Dr. Nichols gave it as his opinion that deceased was not rational at the time. This testimony raised a question of fact as to deceased's mental status when the declaration was made and the court properly instructed the jury if they found that deceased was not rational at the time, or if they entertained a reasonable doubt thereof, then they must not consider for any purpose the purported dying declaration. Some of the statements in the declaration, notably one in which deceased says that appellant shot at him six times and Carl shot at him four times, seems out of harmony with the otherwise undisputed facts that appellant only fired three times and that Carl did not shoot at deceased at all, and is persuasive that deceased was not at himself mentally, yet it still remains an issue of fact for the jury. There is no way for us to know if the jury did or did not consider the declaration. If we could indulge in speculation as to the matter, the verdict being only for six years might indicate that the jury may have disregarded the declaration altogether. The dying declaration introduced in evidence is as follows:

"I was in bakery out of way. I had been followed all morning by the Densons, all of them. Pat saw me when I looked for Papa. When I opened back door Pat shot me and said 'God

damn you am going to kill you.' Carl shot four times at me, Pat shot six times at me. 1st shot only shot that hit me. Shot fired by Pat—distance twenty or thirty feet. I realize I am dying. I was not armed at the time."

Objection was urged to the expression "I had been followed all morning by the Densons, all of them," as being a conclusion of deceased and inadmissible. The rule is well settled that nothing is admissible in a dying declaration that would not be admissible had the declarant been sworn and testifying as a witness. Roberts v. State, 5 Tex. Crim. App. 141; Warren v. State, 9 Tex. Crim. App. 629; Manley v. State, 62 Tex. Crim. Rep. 293, 137 S. W. 1140; Drake v. State, 143 S. W. 1160. If declarant had been testifying we think the statement objected to would have been received in evidence as a shorthand rendition of the facts. See Warren's case (supra) and many other authorities collated in Branch's Ann. Tex. P. C., Sec. 1865. The same objection was urged to other sentences found in the dying declaration but in our opinion it is even more untenable as to them than to the one particularly discussed.

The defense being based in part upon threats proven to have been made by deceased against and communicated to appellant it was permissible for the state to prove the general character of deceased under Art. 1258 P. C. (1925). The proof was that deceased's reputation was good as a 'peaceable, law-abiding citizen.' One objection was that appellant had not put deceased's general reputation in issue. This is not tenable. By the very terms of the above statute he had put it in issue when he proved the threat. The only other objection was that deceased's reputation as a 'law-abiding' citizen was incompetent. This objection is elaborated in the brief by calling attention to the fact that said statute provides that evidence touching deceased's character shall extend only to an inquiry as to whether the deceased was a man of violent or dangerous character, or a man of kind and inoffensive disposition," etc. The exact wording of the statute now invoked by appellant was not called to the court's attention by the objection urged, but if it had been we are of opinion proof that deceased enjoyed the reputation of being a "peaceful, law-abiding" man comes within the meaning of the statute. Berry v. State, 73 Tex. Crim. App. 203, 163 S. W. 964; Ghent v. State, 76 Tex. Crim. Rep. 523, 176 S. W. 566; Alexander v. State, 95 Tex. Crim. Rep. 497, 255 S. W. 408.

The appellant, in bill of exception No. 5, complains of the action of the court in permitting the state to prove by the witness J. A. Brawley that immediately after hearing the shots

that killed his son, the deceased, he saw Charley Denson, L. Denson, Hugh Denson and "Old Man Denson" across the street and that L. and Hugh Denson drew pistols on him, and that Carl Denson, within ten minutes thereafter, shot at him four times in the back alley. The appellant objected to this testimony on the ground that it was hearsay, immaterial and prejudicial to his rights. This bill shows that the transaction involved in the testimony objected to occurred within ten minutes after the fatal shooting of the witness' son by appellant. It was evidently the contention of the state that appellant, his grandfather, uncle, father and brothers had congregated in the town of Spur for the purpose of bringing about this difficulty and had conspired to do so, and if the testimony of the state's witnesses is to be believed, the state's contention is borne out. It further appears from the state's evidence that the appellant and his relatives had not only conspired against the life of deceased, but also against that of the witness J. A. Brawley. Gordon Parks, a witness for the state, testified that appellant on Saturday evening, after the fight between deceased and J. A. Brawley and appellant's brother, Carl Denson, was inquiring for J. A. Brawley, asking "Where is the son-of-a-bitch?" and stating, "By God, I want him." On the following morning appellant appeared in town armed with a pistol and he and his brother Carl, who was running at the time, were seen to go in the direction of the garage where deceased and J. A. Brawley left their car. There was other evidence to the effect that immediately prior to the homicide the Densons were seen watching or following the Brawleys, and that immediately after the firing of the fatal shot, J. A. Brawley was confronted by L. and Hugh Denson, who drew their pistols on him, and he was shortly thereafter shot at four times by Carl Denson. This testimony was corroborated in part by two officers, who testified that they took a pistol from Hugh Denson about the time mentioned and saw Carl Denson draw a pistol. We think this testimony clearly raised the issue of a conspiracy, and that the trial court committed no error in admitting the testimony complained of. The contention of appellant's counsel in his brief to the effect that if any conspiracy was shown, it had ended prior to this time, is not tenable. It is true the testimony shows that the shooting of deceased by appellant had occurred about ten minutes prior, yet, taking into consideration all the facts and circumstances shown in the state's evidence, it appears with reasonable certainty that the Densons were seeking J. A. Brawley as well as deceased. In so far as J. A. Brawley was

concerned, the transaction had not ended. We believe said testimony was clearly admissible.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE—Appellant insists that the ruling of the trial court and of this court on the original hearing offends against Article 1258, P. C., 1925, which reads thus:

"Where a defendant accused of murder seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made.  *  *  * In every instance where proof of threats has been made, it shall be competent to introduce evidence of the general character of the deceased. *Such evidence shall extend only to whether the deceased was a man of violent or dangerous character, or a man of kind and inoffensive disposition, or whether he was such a person as might reasonably be expected to execute a threat made.*"

The statute has been uniformly construed so that when one accused of homicide interposes self-defense as a justification and introduces evidence to the effect that he had been informed that his life has been threatened by the deceased, the state may meet such defensive testimony by evidence touching the character of the deceased. On the trial of the present case, the situation was such as opened the way for the state to invoke the operation of the statute mentioned. The privilege of the state, however, would extend no further than the limiting clause of the statute underscored above. See Plasters v. State, 1 Tex. Crim. App. 673, page 683. Expressions in Berry v. State, 73 Tex. Crim. Rep. 203; Ghent v. State, 76 Tex. Crim. Rep. 523; Alexander v. State, 95 Tex. Crim. Rep. 497, are distinguished by the evidence under consideration in the cases mentioned and are not to be taken as ignoring the terms of the statute. In both the Ghent case and the Berry case, supra, the testimony to the effect that the deceased bore the reputation of a "law-abiding citizen" was justified upon the evidence introduced by the accused other than specific threats to take his life. In Richardson's case, 253 S. W. 277, the language challenged was "that the reputation of the deceased for *peace and quietude* was good." The court regarded the language mentioned, namely, "peace and quietude" as synon-

ymous in substance with "kind and inoffensive." From the opinion we quote:

"The language in which the proof was made was that the general reputation of the deceased for *peace and quietude* was good. The question was framed in language often found approved in the reports. One who is of a quiet and peaceful disposition is not of a violent and dangerous one. *One is peaceable who is not quarrelsome.* Webster's Dict. *A peaceful man is one who is quiet and harmless in his behavior.* Cyclopedic Dict., page 678."

In the present instance the appellant having introduced evidence of communicated threats upon the part of the deceased, the state sought to introduce evidence supporting the character of the deceased. The bill of exceptions contains the following:

"BE IT REMEMBERED, that upon the trial of the above numbered and styled cause the defendant proved communicated threats of the deceased to take his life *but that defendant did not put in issue the general reputation of deceased,* and that thereafter and after the defendant had rested, the state, over defendant's objections, was permitted to prove by the witness Ed McArthur as follows:

" 'I was acquainted with Edgar Brawley during his lifetime in Spur. I was acquainted with the general reputation of Edgar Brawley, before he was killed, as being a peaceful, law-abiding citizen, before he was killed. His reputation was good.'

"Defendant objected to said questions and answers and said evidence *for the reasons that the defendant had not put in issue the general reputation of deceased and that his reputation as a law-abiding citizen was incompetent and prejudicial evidence.*"

It is to be noted that the question propounded is not set out in the bill but that the answer alone appears. The objection urged was that italicized above, levelled against the question and answer. In the absence of a recital in the bill to the contrary, this court must assume that the question was a proper one and calculated to impress the trial court with the view that the appellant contended *that there was no evidence before the jury justifying proof touching the character of the deceased, and that it was upon that phase of the matter and not upon the mere form of the answer that the trial court was called upon to rule.* In so far as the answer declared that the deceased bore the reputation of a "peaceful" man, it was in line with the statute and the terms of the objection that the evidence was "incompetent and prejudicial" was not adequate to advise the court of the particular

complaint of the answer that is now under consideration. Any language in the original opinion or in the other opinions to which reference has been made which might be construed to mean that in a case like the present the character of the deceased might be attacked upon the ground that he was not a "law-abiding citizen" or supported upon such ground in particulars variant from the subject covered by the statute mentioned (Art. 1258, P. C., 1925) is withdrawn.

Viewing the bill of exceptions in the light of the present record, we are impressed with the view that no error is shown, certainly none which would justify this court in ordering a reversal of the judgment.

Upon the other points presented in the motion no further discussion is deemed necessary or desirable than that which is embraced in the original opinion.

The motion for rehearing is overruled.          *Overruled.*